Filed 12/1/21  P. v. Cretaro CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| THE PEOPLE, | C089800 |
| Plaintiff and Respondent, | (Super. Ct. No. 17CR-000859) |
| v. | |
| ADAM DAVID CRETARO, | |
| Defendant and Appellant. | |

A jury convicted defendant Adam David Cretaro of meeting with a minor for lewd purposes (Pen. Code, § 288.4, subd. (b)),[1] contact with a minor for a sexual offense (§ 288.3, subd. (a)), distributing or showing pornography to a minor (§ 288.2, subd. (a)(2)), and arranging a meeting with a minor for lewd purposes (§ 288.4, subd. (a)(1)). The trial court sentenced defendant to serve 180 days in jail and 5 years of formal probation.  The trial court also ordered defendant to register as a sex offender.  (§ 290.)

---

[1]    Undesignated statutory citations are to the Penal Code.

On appeal, defendant contends (1) the trial court erroneously excluded the testimony of three witnesses, (2) the prosecutor committed misconduct by improperly appealing to the jury's emotions, (3) if the prosecutor's misconduct is not a cognizable error for lack of timely objection, defendant received ineffective assistance of counsel, (4) defendant was entitled to dismissal because the evidence, as a matter of law, showed entrapment, and (5) we must reverse based on the prejudice resulting from the cumulative effect of the errors he argues on appeal.

We conclude that the trial court did not err in excluding the testimony of the three proposed witnesses on grounds of relevance and cumulative evidence. Defendant did not receive ineffective assistance of counsel because the prosecutor did not commit misconduct during closing argument. The evidence did not establish, as a matter of law, that defendant was entrapped. Because we have not identified any trial error, there was no prejudice to cumulate. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### *Prosecution Evidence*

On February 22, 2017, Red Bluff Police Department Detective Heidi Curtis posted an online ad in the "Casual Encounters" area of Craigslist that "was just purely for, as it said, casual sexual encounters." Detective Curtis was participating in a sting operation with the district attorney's office to address online sex trafficking. The ad stated: "Looking for hookup, W4M, Red Bluff," and described the person posting the ad as "curvy, 5-4, and single."

On February 23, 2017, defendant responded to the ad, saying: "I'm game for fun. I'm Adam, fit, frisky, etc." and that he was "naughty, but a gentleman." Defendant also posted "the photograph of a penis and a photograph of a person on the beach." Curtis

2

told him her name was "Maddie"[2] and posted a photo "of a picture of a girl who's taking, essentially, a selfie of herself in a bathroom mirror." Curtis did not know the identity or age of the person in the picture that she posted.

Communication between defendant and Detective Curtis "was very minimal or sporadic" over the course of the next month. The minimal response from Curtis was the result of her being overwhelmed by the number people who responded to the same ad.

On March 29, 2017, Detective Curtis communicated with defendant: "I was down to hang out, but I couldn't text him, my mom took my cell phone away when report cards came out and my mom was fucked-up like that. He later asked me, I want to say about 15 minutes later, asked me how old I was. I told him that I was almost 16. I live in Red Bluff. I told him I look older though and I'm mature for my age." Defendant asked about her school and whether she had "ever done this before." Detective Curtis responded "that I knew [someone] who was younger than I was that hooked up with older guys. Um, he told me that he was 33. And then he said that he was a little worried about my age, because that's considered statutory rape."

Defendant then sent her a photo of condoms and lubricant, and indicated he would bring rubber bands that "increased the firmness of the penis." Defendant "already was wanting to know how I was going to do in the bedroom and said not sure if you can handle me, you look pretty small, I might split you in two with my big cock. Then he went on about [how] he was 9 inches and wanting to do – or wanting to know about if I would try anal and deep throat." Detective Curtis testified, "I asked him if he was willing to teach me, I was willing to learn. And then he wanted to know if I ever swallowed cum before. . . . And wanted to know if I liked deep penetration." Defendant asked more questions of Detective Curtis, stating "I like to get to know someone before just banging

---

[2] Detective Curtis mistakenly spelled the first name of the fictional minor two ways. In other correspondence, she gave the name as Addie Paulson.

3

their brains out." Detective Curtis's responses "essentially [were] all about being young, like you say about me and my mom's slave, sometimes I go [to] my dad's on the weekend." Defendant was "responding that he's got his life together . . . doesn't like to get in trouble with the law and such." During this communication, Detective Curtis was at her office in Red Bluff and defendant said he was in Redding. At some point during their communications, defendant indicated he was concerned about Detective Curtis's age. Detective Curtis replied, "you can't rape the willing."

Defendant proposed to meet, saying, "We need to meet so I know you're not a serial killer, or a cop, or detective, LOL, or creeper." Detective Curtis replied, "how about tomorrow after my mom goes to work." Defendant asked for more photos, but Detective Curtis demurred. Detective Curtis replied, "I told him, let's meet at the old Walmart and we can go to my house from there if you aren't creepy. . . . And he responded with, gotcha, that sounds like a good plan. . . . [Y]ou'll see that I'm normal and hopefully you'll be normal, but I can come back and smack you in the face with my big cock."

Communications over several days culminated in defendant agreeing to meet at "the old Walmart." Defendant then suggested meeting at the nearby Raley's supermarket, but Detective Curtis refused because the police "didn't want to do a takedown" at a busy public place. Detective Curtis had information on the type of vehicle defendant was driving. When defendant arrived, police officers took defendant into custody. Defendant's vehicle was searched and towed. Inside the vehicle, police officers found a plastic bag containing the same brand of condoms and lubricant that were depicted in the photo that defendant sent to Detective Curtis.

Detective Curtis interviewed defendant in custody. Defendant acknowledged being the person who had been communicating with Detective Curtis. Detective Curtis asked why defendant's telephone number on his booking sheet did not match the phone number in their earlier communications. Defendant explained that he "used a texting

4

app." Regarding the condoms and lubricant, defendant said he always had them in his car. A forensic search of defendant's cell phone pursuant to a search warrant did not reveal any child pornography or young female contacts. Nothing incident to the search defendant's car or cell phone indicated any kind of interest of defendant in underage girls.

### Defense Evidence

Defendant introduced the testimony of seven witnesses on his behalf. Amanda Perkins testified that she met defendant on a dating site called Plenty of Fish. She had a dating relationship with defendant for about six months before they became sexually intimate. Based on her experience with defendant, Perkins described defendant as "normal sexually" and having no interest in young girls. Defendant expressed no interest in anal sex or having her swallow his semen.

Shawn Clark testified that he had been friends with defendant and his family for 10 years. Approximately five or six years earlier, defendant texted a picture of his penis next to some quarters to a female friend. Friends teased defendant about "the quarter picture" over ensuing years. Clark testified that defendant always dated women his age or older. Clark also believed that defendant possessed good moral character and was always appropriate around Clark's children. Clark "[a]bsolutely" trusted defendant around his younger children. Defendant had never shown an interest in young girls. It was not within defendant's character to seek an underage girl with whom to have sex. Clark testified that he did not think defendant "would follow through and actually have sex with an underaged girl."

Alecia Carlton testified she and defendant became best friends after meeting when she was 17 years old. They were never intimate, and their relationship was purely platonic. Carlton noted that defendant had "dated quite a few women, but they have all been quite a bit older." It was "[a]bsolutely not" consistent with defendant's character to meet for the purpose of committing a lewd act on an underage girl. Defendant "has such

5

a good heart and good character." Defendant is "a jokester" and thus Carlton would not take seriously explicit e-mails – including photos of genitals – that he might send. Carlton also believed that defendant would "absolutely not" knowingly engage in sex with an underage person. She knew that defendant carried condoms in a "zip-lock thing" in his truck for "[y]ears and years." Carlton was surprised that defendant communicated with a person "identifying themselves as a 15-year-old and discussing oral sex, anal sex, normal sex" and sending videos of women performing oral sex. She was also baffled that defendant drove to the meeting place.

Sophia Pusateri testified that defendant is a close family friend to her parents. She met him when she was 15 years old and had spent time with defendant during the summers on her parents' houseboat. She also had friends her age stay on the boat too. Defendant never expressed any romantic interest in her, her friends, or any other teenager. Pusateri did not know of anyone who thought defendant was "creepy."

Robbie Clearie employed defendant as a bartender and observed him on a nightly basis. Clearie described defendant as "very personable, very charismatic, and he had a pension for older women. Most of the women he interacted with in the bar that he socialized with there and outside of were always 10 to 20 years older than him." Defendant showed no interest in young girls. Clearie and others teased him about "quarter picture." Clearie thought defendant could engage in "[l]ewd, crude conversations" but not with a minor.

Amber Graham met defendant at a Facebook barbecue 11 years prior to her testimony. They dated for two months before becoming sexually intimate. They maintained their friendship after their dating relationship ended. Graham did not observe defendant express any sexual interest in minors and added defendant was typically interested in older women. Graham is a single mother and would feel comfortable calling defendant to babysit her daughters. She did not think defendant was the kind of person who would meet with an underage girl for the purpose of a lewd act. Graham knew

6

defendant carried condoms and lubricant.  She carries the same herself.  Graham concluded, "I don't think he was intending to do anything.  I think it was a joke online for fun."

Dr. Kent Caruso testified regarding forensic psychology.[3]  Dr. Caruso evaluated defendant to assess the risk of future illegal behavior involving children or any other criminal matter.  Dr. Caruso concluded that defendant "is an intelligent individual" for whom he had "no concerns about his emotionality or emotional dysfunction or disturbance, no propensity whatsoever towards any disconnection with reality . . . ."  He found nothing that would indicate "any involvement in any type of sexually assaultive, abusive, or other exploitative behavior sexually."  Dr. Caruso found nothing that would worry him that defendant would engage in deviant or criminal fashion in the future.  In so answering, Dr. Caruso explained that sexual deviance is a function of culture.  As an example, Dr. Caruso cited that the age of consent in many states and in Canada is 16 years of age.  In Hawaii, a 14-year-old girl can have consensual sex with a 19-year-old as long as there is no more than 5 years' age difference.  Thus, Dr. Caruso stated that in "California that 19-year-old is a sexual deviant and in Hawaii no problem."  For that reason, he could not "define what sexual deviancy is."

Dr. Caruso explained that online forms of communication allowed people to express publicly what they might otherwise only think to themselves privately.  However, the lack of immediate physical consequence encouraged expression of private thoughts and fantasies that people would not express in face-to-face interactions.  Dr. Caruso did not believe this represents a healthy change in communications, but one that is the current reality.  Based on his risk assessment of defendant, Dr. Caruso would have "put my

---

[3]    Both parties seemed to have assumed that Dr. Caruso was testifying as an expert on forensic psychology even though the defense did not formally move to admit his testimony as an expert.

money on him not doing" what defendant had written to Detective Curtis if defendant had actually come "face-to-face with a 15-year-old female at that point." Dr. Caruso stated, "Based upon the profile personality . . . of [defendant], I would have suspected that enough inhibitory anxiety would have clicked in at that point . . . in all likelihood, he would not have done anything." Dr. Caruso would not consider sex with a 15-year-old to constitute sexual deviancy because in many parts of the world people get married as early as 12 years of age. He added that "all around the world and in our culture . . . it is not abnormal for a fully developed female at 15, 16 years of age to be found attractive by men, and age difference really doesn't have that much to do with it."

**DISCUSSION**

**I**

*Exclusion of Witness Testimony*

Defendant contends the trial court abused its discretion in excluding the testimony of three proposed defense witnesses, two of whom were offered as expert witnesses.

**A.**

*Proposed Witness Valdez*

During trial, defense counsel sought to call Mark Valdez. The following colloquy occurred outside the presence of the jury:

"THE COURT: All right. Let's start with Mark Valdez. What's the offer of proof for Mark Valdez?

"MS. GOODMAN [(defense counsel)]: So, um, he had provided a statement. The importance of Mark Valdez is that he had discussed with the defendant the prank associated with online dating sites, and that's different from any other witness that we have."

This statement was the entirety of defense counsel's offer of proof. The trial court noted that defendant had already called five character witnesses and that "in this case a discussion the defendant had with Mr. Valdez would be hearsay." On this basis, the trial

8

court excluded the testimony. The trial court then asked defense counsel whether there was "[a]nything further on Mr. Valdez?" Defense counsel noted that she had provided Valdez's statement in a timely manner to the prosecution, but did not add to the offer of proof.

The trial court properly excluded the out-of-court discussion between Valdez and defendant as hearsay. Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless subject to an exception, hearsay evidence is inadmissible. (*Id.*, subd. (b).) "We review evidentiary rulings, including ultimate rulings on whether evidence should be excluded as hearsay, for abuse of discretion." (*People v. Caro* (2019) 7 Cal.5th 463, 503.) Here, the evidence concerned an out-of-court statement that constituted hearsay.

On appeal, defendant argues that a hearsay exception applies – namely, the effect that the statement had on the hearer. There is, however, no indication in the record that defendant's trial attorney ever mentioned this hearsay exception to the trial court. For lack of any timely assertion of this hearsay exception, the contention has not been preserved for appeal. As this court has previously explained, "Evidence Code section 354 states the rule: 'A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, *purpose*, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means. . . .' " (*People v. Foss* (2007) 155 Cal.App.4th 113, 126, italics added.) " ' "The offer of proof exists for the benefit of the appellate court. The offer of proof serves to inform the appellate court of the nature of the evidence that the trial court refused to receive in evidence. . . ." ' " (*Id.* at p. 127, quoting *Nienhouse v. Superior Court* (1996)

9

42 Cal.App.4th 83, 93-94.)  Here, the defense did not mention any hearsay exception during trial.  Accordingly, the issue as not preserved for appeal.

## B.

### *Proposed Witness Campbell*

Defendant's trial attorney sought to introduce the testimony of Dr. Kelly Campbell as an expert on deceptive Internet social networking or catfishing.  Defense counsel explained, "don't think the court or counsel were quite familiar with the phenomenon of catfishing, but *it is so prevalent in society today* that there's even a very, um, poplar MTV series, I'm told, called *Catfishing* that's been on the air for a number of years.  [¶] The issue is not all that new, but it is relatively new and it is beyond the understanding and the knowledge of the ordinary person."  (Italics added.)

The trial court excluded the evidence and explained that "the necessity of an expert witness has not been shown here.  The basic argument is that the – there's a phenomenon of people that date online and deceive each other.  And I don't believe the jury needs an expert to tell them that, I think the jury can understand that people lie about relationships online.  I think the jury knows that.  I think the jury knows that, especially that people can be deceptive with online dating."

The trial court did not abuse its discretion in excluding the proposed expert testimony by Dr. Campbell.  " 'A witness is qualified to testify about a matter calling for an expert opinion if [his or her] peculiar skill, training, or experience enable [him or her] to form an opinion that will be useful to the jury.' (*People v. Davis* (1965) 62 Cal.2d 791, 800.)  The question becomes whether the expert opinion given was helpful to the trier of fact.  The reception of expert opinion testimony is within the sound discretion of the trial court.  (*People v. Haeussler* (1953) 41 Cal.2d 252, 261, overruled on other grounds in *People v. Cahan* (1955) 44 Cal.2d 434.)  Even though facts may be within the knowledge or understanding of the trier of fact, the conclusions to be drawn therefrom may require expert testimony.  (*Wells Truckways v. Cebrian* (1954) 122 Cal.App.2d 666,

10

677; 1 Witkin, Cal. Evidence (3d ed. 1986) The Opinion Rule, § 474, pp. 445-446.) 'The decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that [persons] of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*People v. Cole* (1956) 47 Cal.2d 99, 103.) An expert's opinion is admissible when '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Cal. Evid. Code, § 801, subd. (a).)" (*People v. Harvey* (1991) 233 Cal.App.3d 1206, 1226-1227.)

Defense counsel's own statement explains why the trial court did not abuse its discretion in excluding Dr. Campbell's testimony. As defense counsel noted, the use of a false online identity "is so prevalent in society today" that a television show called Catfishing has run "*for a number of years*." (Italics added.) The phenomenon of a writer assuming a false identity is probably as old as writing itself. Even founding father Benjamin Franklin assumed fictional identities in hopes of persuasion. (E.g., *American Civil Liberties Union of Illinois v. Alvarez* (7th Cir. 2012) 679 F.3d 583, 599-600 [writing as "Silence Dogood"]; *Dimanche v. Massachusetts Bay Transp. Auth.* (1st Cir. 2018) 893 F.3d 1, 3, fn. 1 [writing as "Poor Richard"].) The use of a false identity in an online communication is neither new nor beyond the scope of common experience. (E.g., *Matrixx Initiatives, Inc. v. Doe* (2006) 138 Cal.App.4th 872, 875-876 [describing a scheme to use aliases post defamatory statements online by at least one hedge fund trader that allegedly caused " 'unusual' " fluctuations in the price of a stock].) The trial court did not err in concluding that the use of deceptive identities in online communications did not require expert testimony.

## C.

### *Proposed Witness Dempsey*

The defense sought to introduce expert testimony by Dr. Rachyll Dempsey to testify about "sex deviance analysis and psychosexual analysis of [defendant]. She also speaks to the phenomenon of internet dating." The trial court asked, "Isn't that exactly what Dr. Caruso said" in his testimony? Defense counsel responded: "He didn't seem to be able to testify that the category doesn't differentiate. There are different categories, he seemed not to be able to articulate that fact very well. His answer, I think, went into cultural references and cultural norms." The trial court excluded the testimony, expressing concern that Dr. Dempsey's testimony would be cumulative to that offered by Dr. Caruso. The trial court continued: "She was also giving an opinion as to sexual deviancy. I wasn't sure about whether or not she would be testifying as to internet dating, but you have confirmed that just now in your argument. Dr. Caruso certainly testified as to internet dating." The trial court also excluding the proposed testimony on grounds of late discovery to the prosecution.

The trial court did not err in excluding the evidence because Dr. Dempsey's proposed testimony – that defendant was not sexually deviant – did not constitute a defense to any of the charged offenses. Defendant does not offer legal authority showing that proof of lack of sexual deviancy would have had any exonerating effect. Lack of sexual deviance is not an element of or a defense to meeting with a minor for lewd purposes (§ 288.4, subd. (b)), contact with a minor for a sexual offense (§ 288.3, subd. (a)), distributing or showing pornography to a minor (§ 288.2, subd. (a)(2)), or arranging a meeting with a minor for lewd purposes (§ 288.4, subd. (a)(1)). Thus, even though we agree with the trial court that Dr. Dempsey's proposed testimony was cumulative to Dr. Caruso's testimony, the more fundamental consideration is that convincing the jury that defendant lacked sexual deviancy would not have had any probative effect.

12

# II

## *Prosecutorial Misconduct During Closing Argument*

Defendant contends the prosecutor engaged in misconduct by appealing to the passions and prejudices of jurors during closing argument. Specifically, defendant argues that the prosecutor improperly argued that defendant's "acts were motivated by or could have led to the death or kidnapping of a child." The record shows that defendant's trial attorney did not object or request that the jury be admonished. Thus, defendant argues that his convictions must be reversed because the failure to object or request admonishment constituted ineffective assistance of counsel. Accordingly, we review the claimed error through the lens of defendant's constitutional right to the effective assistance of counsel. We conclude there was no error.

## A.

## *Review of Claims of Prosecutorial Misconduct During Closing Arguments*

As the California Supreme Court has explained, " 'a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 679, quoting *People v. Riggs* (2008) 44 Cal.4th 248, 298.) Under the federal Constitution, prosecutorial misconduct results if "the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144] . . . .)" (*Riggs*, at p. 298.) However, " ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' " (*Ibid.*, quoting *People v. Stanley* (2006) 39 Cal.4th 913, 952.)

13

Here, defendant's trial attorney failed to preserve the issues of prosecutorial misconduct by not requesting the jury be admonished as to any claimed instance of misconduct. Anticipating forfeiture, defendant asserts that he received ineffective assistance of counsel for lack of objection or request for admonition by his trial attorney. "A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) To establish ineffective assistance of counsel, defendant must show that "(1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Johnson* (2015) 60 Cal.4th 966, 980, quoting *People v. Scott* (1997) 15 Cal.4th 1188, 1211.)

**B.**

***The Prosecutor's Closing Argument***

During closing argument, the prosecutor argued to jurors: "You will see in the instruction given by the judge, he's given it to you, and you'll have it in your hand when you go back, that in California people under 18 are children. And *we have a duty to protect children*." (Italics added.)

The prosecutor further argued: "I'd submit to you that he was trolling on Craig's List and he saw an advertisement that caught his eye and he followed up with that advertisement for weeks without any real communication. He kept after it. And then at the end, Detective Curtis started responding regularly and it snowballed quickly and it got

14

ugly quickly. He was enticed and he was happy and he wanted to come down here and have sex with this young girl. [¶] *There could have been a victim. It is our duty to protect kids like that.* And if we -- and *if we just sit back and passively wait* to get, you know, some kid to come forward and say this happened to me, then there'll never be any enforcement. *We'll have kids being victimized. We'll have kids being taken advantage of. We'll have kids disappearing.* We're doing what we can." (Italics added.) Similarly, the prosecutor went on to state: "Sure, there wasn't a real victim. There wasn't a real Addie Paulson. But there are victims in this community *who are at risk.*" (Italics added.)

Defendant argues that the italicized portions of the prosecutor's closing argument constituted misconduct that requires reversal.

## C.

### *Analysis*

At the outset of our analysis we note the California Supreme Court's guidance that " '[u]nless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." ' [Citations.] When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ' " 'no conceivable tactical purpose' " for counsel's act or omission.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674-675, quoting *People v. Lewis* (2001) 25 Cal.4th 610, 675.) Thus, "[t]he decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.)

Here, the portions of the closing argument now highlighted by defendant were brief comments during the prosecutor's closing argument. The primary focus of the prosecutor's argument was the graphic and lurid nature of defendant's online communications with Detective Curtis. The prosecutor also highlighted the photos of

15

defendant's supply of condoms, lubricant, and rubber bands. In contrast to the prosecutor's emphasis on this highly impactful evidence, the brief topic regarding the lack of an actual underage victim was fleeting. Defense counsel could reasonably have made the tactical decision not to emphasize the possibility of risk to minors when the fleeting remarks paled in comparison with the sharpness of the actual evidence referred to by the prosecution. The statements by the prosecutor regarding the lack of an actual underage victim were not inflammatory nor did they appeal the prejudices of jurors. Due to the noninflammatory nature of the statements regarding risks to minors in the future, defendant's trial attorney had a reasonable, tactical basis for not objecting to these statements.

Moreover, the trial court instructed the jury: "Do not let bias, sympathy, prejudice, or public opinion influence your decision." As the California Supreme Court has explained, " 'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' " (*People v. Smith* (2007) 40 Cal.4th 483, 517, quoting *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) We presume that the jury followed this instruction to avoid deciding based on sympathy or prejudice. (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 37.)

### III

### *Entrapment*

Defendant argues that we must reverse the judgment because the evidence at trial established as a matter of law that he was entrapped by the police. Specifically, defendant asserts that the evidence established entrapment because Detective Curtis "explicitly told [defendant] that it would not be illegal for the [defendant] to have consensual sex with a 15-year-old girl," and by "asserting that she had a younger friend who also would 'hook up' with older men." We are not persuaded.

16

## A.

### *Evidence Presented at Trial*

During trial, Detective Curtis recounted that communications with defendant unfurled as follows:

"Q. [(by the prosecutor)] And, from [March 29, 2017,] forward could you describe the nature of the communications? [¶] . . . [¶]

"A. [(by Detective Curtis)] Okay. Initially we talked about hanging out. I made a reference that I was down to hang out, but I couldn't text him, my mom took my cell phone away when report cards came out and my mom was fucked up like that. He later asked me, I want to say about 15 minutes later, asked me how old I was. I told him that I was almost 16. I live in Red Bluff. I told him I look older though and I'm mature for my age."

Detective Curtis went on that she told defendant, "*I talked about my friend in Anderson that I knew who was younger than I was that hooked up with older guys*." (Italics added.)

Detective Curtis further testified that she indicated to defendant that sex would be "consensual" with the hypothetical minor:

"Q. [(by the prosecutor)] And when [defendant] indicated, um, that he was concerned about your age, *you said you can't rape the willing*, duh. Is that right?

"A. [(by Detective Curtis)] Yes.

"Q. And that was in an effort to let [defendant] know that the sex, if you were going to have it, would be consensual; correct?

"A. Correct." (Italics added.)

Defendant argues that the italicized portions of Detective Curtis's testimony established entrapment as a matter of a law so that his judgment must now be reversed.

17

In so arguing, defendant acknowledges that his jury was instructed on entrapment as follows:

"Entrapment is a defense. The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard from proof beyond a reasonable doubt. To meet this burden, the defendant must prove that it is more likely than not that [he] was entrapped. [¶] A person is entrapped if a law enforcement officer [or his or her agent] engaged in conduct that would cause a normally law-abiding person to commit the crime. [¶] Some examples of entrapment might include conduct like badgering, persuasion by flattery or coaxing, repeated and insistent requests, or an appeal to friendship or sympathy. [¶] Another example of entrapment would be conduct that would make commission of the crime unusually attractive to a normally law-abiding person. Such conduct might include a guarantee that the act is not illegal or that the offense would go undetected, an offer of extraordinary benefit, or other similar conduct."

**B.**

***Entrapment***

"In California, the test for entrapment focuses on the police conduct and is objective. Entrapment is established if the law enforcement conduct is likely to induce a *normally law-abiding person* to commit the offense. ([*People v.*] *Barraza* [(1979)] 23 Cal.3d [675,] 689-690.) '[S]uch a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.' (*Id.* at p. 690.)" (*People v. Watson* (2000) 22 Cal.4th 220, 223.)

"Entrapment is ordinarily a fact question. (*People v. Barraza, supra*, 23 Cal.3d at p. 691, fn. 6.) . . . [¶] An appellate court will only find entrapment as a matter of law

where 'the evidence is so compelling and uncontradicted the jury could draw no other reasonable inference.' " (*People v. Lee* (1990) 219 Cal.App.3d 829, 836, quoting *People v. Thoi* (1989) 213 Cal.App.3d 689, 694.) "While case law concedes the possibility of such a finding by an appellate court, it would be a rare result indeed." (*People v. Thoi*, at p. 693.)

## C.

### *Evidence*

We reject the contention that the evidence at trial established entrapment as a matter of law. Certainly, the evidence does not establish entrapment as to distributing or showing pornography to a minor (§ 288.2, subd. (a)(2)). There is no evidence in the record suggesting that Detective Curtis somehow invited defendant to send her pornographic images.

We conclude that reversal is also not required as to the charges of meeting with a minor for lewd purposes (§ 288.4, subd. (b)), contact with a minor for a sexual offense (§ 288.3, subd. (a)), and arranging a meeting with a minor for lewd purposes (§ 288.4, subd. (a)(1)). Detective Curtis's mention of other hypothetical peers who "hooked up" with older men did not constitute flattery, badgering, cajoling, importuning, or another form of communication that can be construed to constitute entrapment. (*People v. Watson*, *supra*, 22 Cal.4th at p. 223.) We also reject the proposition that Detective Curtis's stating – under the pseudonym Addie Paulson – that "you can't rape the willing" entrapped defendant. Minors are incapable of giving consent, and defendant's repeated concerns about Addie's age indicated his awareness of that sex with minors cannot be lawful. Defendant told Detective Curtis during one of their online communications that "he was a little worried about my age, because that's considered statutory rape." Moreover, the isolated, erroneous statement by Detective Curtis regarding consent cannot be taken to constitute the sort of communication that would cause an otherwise law-abiding person to meet with a minor for sexual purposes. (*People v. Thoi*, *supra*, 213

19

Cal.App.3d at pp. 693-694.) In this case, the jury was presented with a factual question regarding entrapment for which the evidence supported the conclusion that Detective Curtis did not provide more than an opportunity to commit the charged offense.

## III

### *Cumulative Error*

Defendant seeks reversal based on cumulative error. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) In this case, we have not identified any trial error. Accordingly, there was no prejudice to cumulate.

## DISPOSITION

The judgment is affirmed.

   /s/                    
HOCH, J.

We concur:

  /s/                    
ROBIE, Acting P. J.

  /s/                    
RENNER, J.